IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS APODACA, GERALD SILVER,
and MARIA TRUJILLO, on behalf of
themselves and others similarly situated,

        Plaintiffs,

vs.                                                                                    No. CIV 24-1240 JB/GBW

CITY OF ALBUQUERQUE,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss and to Defer Ruling Until the Tenth Circuit has Decided the Issue Presented, filed January 17, 2025 (Doc. 4)("MTD").  The Court holds a hearing on September 5, 2025.  See Clerk's Minutes at 1, filed September 5, 2025 (Doc. 26).  The primary issues are:  (i) whether the Court should defer ruling on the MTD until the United States Court of Appeals for the Tenth Circuit decides Silver v. City of Albuquerque, 134 F.4th 1130 (10th Cir. 2025), where the issue in this case -- whether a municipality is a "person" under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") -- is before the Tenth Circuit;  (ii) whether the Federal Communications Commission's ("FCC") ruling -- In the Matter of Rules and Regulations Implementing the TCPA of 1991, Broadnet Teleservices LLC Petition for Declaratory Ruling, National Consumer Law Center Petition for Reconsideration, CG Dkt. No. 02-278, 35 FCC RCD. 15052 (Dec. 14, 2020)("Broadnet II") -- finding that a municipality is a "person" under the TCPA  binds the Court under the Hobbs Act, 28 U.S.C. § 2342; (iii) whether the Court is required to give Skidmore[1] deference to the FCC ruling in Broadnet II; and (iv) whether

---

[1] Under Skidmore v. Swift & Co., 323 U.S. 134 (1944)("Skidmore"), administrative agencies decisions, such as the FCC's decisions, although not binding, "do constitute a body of

Defendant City of Albuquerque, as a municipal corporation, is a "person" under the TCPA, such that the statute applies to the City of Albuquerque.   The Court concludes:  (i) the Court will not defer ruling on the MTD, because the Tenth Circuit decides Silver v. City of Albuquerque on April 23, 2025; (ii) the Court is not bound under the Hobbs Act by the FCC's decision in Broadnet II; (iii) the Court does not give Skidmore deference to the FCC's decision in Broadnet II; and (iv) the City of Albuquerque, as a municipal corporation, is not a "person" under the TCPA, and, therefore, the City of Albuquerque is not subject to the TCPA.  Accordingly, the Court grants the MTD.

**FACTUAL BACKGROUND**

For the purposes of a motion to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure the Court assumes the Plaintiffs' well-pleaded factual allegations are true.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).  Plaintiffs Dennis Apodaca, Gerald Silver, and Maria Trujillo, on behalf of themselves and others, bring this lawsuit alleging that the City of Albuquerque makes pre-recorded voice calls promoting virtual town halls in violation of the TCPA. Class Action Complaint for Damages and Injunctive Relief Pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 *et seq.* And Demand for Jury Trial ¶ 30, at 6, filed December 11, 2024 (Doc. 1)("Complaint").  Congress enacts the TCPA in response to voluminous complaints about telephone call abuses, in recognition that unrestricted calls can be an intrusive invasion of privacy, and to provide some control over calling practices.  Pub. L. 102-243 § 2 (1991); see Facebook, Inc. v. Duguid, 592 U.S. 395, 399 (2021).  To act in accordance with the law, a caller

---

experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore, 323 U.S. at 140.  The Court's deference depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140.

making a prerecorded voice call to a cellular telephone for a non-emergency purpose must have the recipient's prior express consent to receive such a call.  See In the Matter of Rules and Regulations Implementing the TCPA of 1991 ("In re TCPA"), Blackboard, Inc. et al. Petition for Expedited Declaratory Ruling, CG Dkt. No. 02-278, 31 FCC Rcd. 9054, ¶ 19 at 9061 (Jul. 8, 2016)("Blackboard").  That rule applies regardless whether the call involves telemarketing.  See Blackboard ¶ 19, at 9061.

For several years, the City of Albuquerque has contracted with Control Point, LLC to assist the former in holding virtual town halls and in using prerecorded calls to promote them.  See Complaint ¶ 31, at 7.  Since the City of Albuquerque has been working with Control Point, the latter has contracted with Broadnet Teleservices LLC to use Broadnet's platforms to promote and hold virtual town halls.  See Complaint ¶ 33, at 7.  Broadnet provides the capabilities to promote and hold mass, interactive virtual events, including virtual town halls and live conferences.  See Complaint ¶ 34, at 7.  Broadnet provides a virtual town hall product that allows the City of Albuquerque to host professional and moderated conversations with its audience members via landline telephone, mobile device, and online video or audio streaming.  See Complaint ¶ 35, at 7. Broadnet also supplies an auto-calls notifications product that permits the City of Albuquerque to send many thousands of pre-recorded voice messages in an automated way, delivering them to telephone numbers where they would be heard when the recipients picked up the telephone or listened to their voicemail.  See Complaint ¶ 36, at 8.  The City of Albuquerque informs Control Point when it wants to schedule a town hall, and Control Point then relays this information to Broadnet for technical processing. See Complaint ¶ 39, at 8.  The City of Albuquerque also provides Control Point with information to use for promoting the virtual town halls, including the content, timing, and telephone numbers to be used for the promotion, and Control Point then passes this

information on to Broadnet for transmission.  See Complaint ¶ 40, at 8.  The City of Albuquerque obtains the numbers to which it makes calls promoting the virtual town halls from 311, the City of Albuquerque's centralized call center, data aggregation firms, and other sources.  See Complaint ¶ 41, at 8.  The City of Albuquerque determines the numbers from which the prerecorded voice calls will appear as having been made, despite its use of Broadnet's auto-call notifications product, to prevent the recipients from filtering, rejecting, or screening the calls.  See Complaint ¶ 43, at 9.  At a minimum, on June 13, 2023, June 14, 2023, November 9, 2023, July 17, 2024, and August 29, 2024 the City of Albuquerque makes calls to recipients promoting virtual town halls held on June 14, 2023, November 9, 2023, July 17, 2024, and August 29, 2024.  See Complaint ¶ 45, at 9.  The City of Albuquerque does not obtain prior express consent from the vast majority of those persons to whom it makes prerecorded calls promoting the virtual town halls, even where the calls are made to recipients' cellular telephones.  See Complaint ¶ 47, at 9.  The content of the prerecorded voice calls made in and after June, 2023, does not support them having been made for emergency purposes.  See Complaint ¶ 51, at 10.

All three named plaintiffs, Apodaca, Silver, and Trujillo, have received prerecorded voice calls from the City of Albuquerque on their cellular telephones promoting the virtual town halls since June, 2023, even though they have never given the City of Albuquerque express consent to make such calls.  See Complaint ¶ 60, at 11.  On June 13, 2023, and June 14, 2023, Apodaca receives on his cellular telephone prerecorded calls from the City of Albuquerque promoting a virtual town hall it is holding on June 14, 2023.  See Complaint ¶ 61, at 11.  The prerecorded call that Apodaca receives on June 13, 2023, states:

> Hello. I'm calling from Mayor Tim Keller's office and the City of Albuquerque to invite you to a live telephone town hall tomorrow around this time. You will receive a call like this one, inviting you to participate. There is no cost to join; simply stay on the line. This is your chance to hear directly from Mayor Keller and City leaders,

and ask questions about the City's initiative and programs. For more information visit cabq.gov/townhall or call our Community Contact Center at 311 or (505) 768-2000.

Complaint ¶ 63, at 12.  The prerecorded call that Apodaca receives on June 14, 2023, states:

 Hi. I'm calling from Mayor Tim Keller's office and the City of Albuquerque to invite you to join us for a telephone town hall meeting that is happening right now. Sorry we missed you. To stay up to date on these events, please visit cabq.gov/townhall or call our Community Contact Center at 311 or (505) 768-2000.

 Complaint ¶ 64, at 12.  Silver and Trujillo receive calls on November 9, 2023, substantially similar in content to the calls received by Apodaca.  See Complaint ¶ 66, at 12-13.  Apodaca and Trujillo receive more calls on July 17, 2024, and Silver receives another call on August 29, 2024.  See Complaint ¶¶ 71, 77, at 13-14.  Apodaca, Silver, and Trujillo all allege that the City of Albuquerque's prerecorded calls harm them; that the calls are a significant nuisance to them, variously interfering with their peace and solitude, work, personal activities, and efforts to care for family members, and causing them to suffer intrusive invasions of privacy.  See Complaint ¶¶ 87, 88 at 15.

This case is the second of related lawsuits challenging the City of Albuquerque's prerecorded calls advertising town halls under the TCPA.  See Silver v. City of Albuquerque, No. 1:22-CV-00400-MIS-GBW, 2023 WL 2413780 (D.N.M. Mar. 8, 2023)(Strickland, J.), aff'd, 134 F.4th 1130 (10th Cir. 2025).  Silver, a plaintiff in this lawsuit, files an earlier lawsuit in the District of New Mexico against the City of Albuquerque, alleging that the prerecorded calls that he receives from the City of Albuquerque during the COVID-19 pandemic, which inform Silver about virtual telephone town hall meetings during the pandemic, violate the TCPA.  See Silver v. City of Albuquerque, 2023 WL 2413780 at *6.  The City of Albuquerque files a motion to dismiss, arguing first that the City of Albuquerque does not meet the definition of a person under the TCPA and therefore is exempt from the statute, and, in the alternative that the calls fall under the TCPA's

emergency purposes exemption.  See Defendant City of Albuquerque's Motion to Dismiss, at 1, Silver v. City of Albuquerque, Docket No. CIV 22-0400, (DNM July 27, 2022), ECF No. 11. The Honorable Margaret Strickland, United States District Judge for the United States Court for the District of New Mexico concludes that the calls satisfy the statute's emergency exemption provision, and on appeal, the Tenth Circuit affirms this ruling.  See Silver v. City of Albuquerque, 2023 WL 2413780 at *3; Silver v. City of Albuquerque, 134 F.4th 1130, 1131 (10th Cir. 2025). Neither court addresses the question whether the City of Albuquerque qualifies as a person under the TCPA.  This question is now before the Court.

## PROCEDURAL BACKGROUND

The Plaintiffs file their Complaint against the City of Albuquerque on December 11, 2024, asserting violations of the TCPA, and seek to recover statutory damages, treble damages, and injunctive relief pursuant to § 227(b)(3)(A)-(C) of the TCPA.  See Complaint ¶ 114-16, at 19.  The City of Albuquerque then files the MTD.  The City of Albuquerque moves, pursuant to rule 12(b)(6), to dismiss the claim under the TCPA, arguing that the TCPA does not apply to local governments and, therefore, does not apply to the City of Albuquerque.  See MTD at 1.  The TCPA prohibits "any person" from making telephone calls to cellular telephones using a prerecorded voice.  47 U.S.C. § 227(b)(1).  The City of Albuquerque argues that the definition of "person" does not encompass local governments, pointing to plain language, the statute's history and purpose, and judicial precedent.  See MTD at 4.  Additionally, the City of Albuquerque urges the Court to delay deciding the motion until the Tenth Circuit reaches a decision in Silver, because, at the time that the City of Albuquerque files the MTD, the Tenth Circuit has not yet issued a decision.  See MTD at 12.

In response, the Plaintiffs argue that the TCPA applies to the City of Albuquerque, because:

(i) The Hobbs Act, 28 U.S.C. § 2342, strips district courts of the jurisdiction to hear challenges to FCC orders, and therefore the FCC decision in Broadnet II, where the FCC holds that the definition of person under the TCPA extends to local governments, is controlling; (ii) the statute unambiguously encompasses local governments within the definition of person as the TCPA uses that term; (iii) if the Court concludes that the statute is ambiguous, the FCC's decision in Broadnet II warrants Skidmore deference; and (iv) even in the absence of Skidmore deference to the FCC's Broadnet II decision, the Court should conclude, according to the Court's independent statutory analysis, that the TCPA definition of person encompasses local governments. See Response to Motion to Dismiss at 6, 10, filed February 14, 2025 (Doc. 10)("Response").

In reply, the City of Albuquerque argues first that the FCC decision is not binding and is not entitled to deference. See Reply in Support of Motion to Dismiss and to Defer Ruling Until the Tenth Circuit has Decided the Issue Presented at 1, filed March 19, 2025 (Doc. 16)("Reply"). The City of Albuquerque argues that the Hobbs Act jurisdictional limitation does not apply, because the Hobbs Act gives exclusive jurisdiction to the federal Courts of Appeals only to "enjoin . . . or determine the validity of" the FCC's final orders; the City of Albuquerque maintains that it is asking the Court to interpret a statute, and not to invalidate an FCC decision. See Reply at 1-2; 28 U.S.C. § 2342(1). The City of Albuquerque then argues that the FCC decision is not entitled to Skidmore deference both because the question of statutory interpretation at issue does not rely on the FCC's technical or specialized expertise, and because the FCC decision is not sufficiently persuasive to merit deference. See Reply at 1-2, 6. Finally, the City of Albuquerque returns to statutory interpretation arguments to contend that the Court should conclude that the TCPA does not apply to local governments, and reiterates its appeal for the Court to delay deciding this motion until the Tenth Circuit decides Silver v. City of Albuquerque. See Reply at 6, 12.

The Court holds a hearing on September 5, 2025.  See Clerk's Minutes at 1.  The Court begins by stating that 42 U.S.C. § 1983 greatly influences the Court, noting that § 1983 incorporates local governments within the definition of person.  See Transcript of Hearing at 3:16-19 (taken September 5, 2025)("Tr.")(Court).[2]  The City of Albuquerque responds, and states that 42 U.S.C. § 1983 is not an appropriate comparison, because § 1983 does not define person, whereas Congress defines person under the TCPA.  See Tr. at 4:10-12 (Mullins).  The City of Albuquerque then turns to the definition of person that the TCPA uses, which defines person as an individual, partnership, association, joint stock company, trust, or corporation, and argues that this definition does not extend to local governments.  See Tr. at 6:3-9 (Mullins).  The City of Albuquerque argues that corporation is not commonly understood to incorporate municipal corporation and points to cases supporting this proposition.  See Tr. at 7:16-21 (Mullins).  The City of Albuquerque also points to a canon of construction, noscitur a sociis, which states that words grouped in a list must be given related meaning, and argues that a local government is inconsistent with the other entities in the TCPA definition of person.  See Tr. at 8:23-9:5 (Mullins).  The City of Albuquerque then discusses judicial precedent, cites instances of the United States Code where Congress has specifically brought municipalities within an act's scope, and briefly discusses legislative history.  See Tr. at 10-13 (Mullins).  Next, the City of Albuquerque brings up McLaughlin Chiropractic Association, Inc. v. McKesson Corporation, 606 U.S. 146 (2025), in which the Supreme Court concludes that the Hobbs Act does not prevent a district court from interpreting a statute, notwithstanding the existence of an agency's pre-enforcement statutory interpretation, in support of the conclusion that the Court has jurisdiction to interpret the TCPA.  See Tr. at 13:7-13 (Mullins).  Finally, the City of

_____

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Albuquerque reaffirms its argument in its MTD that the relevant FCC decision in Broadnet II should not persuade the Court. See Tr. at 13:23-25 (Mullins).

In rebuttal, the Plaintiffs argue that the FCC decision in Broadnet II is correct and that the Court should give Skidmore deference to this decision. See Tr. at 17:1-2 (Harrison). The Plaintiffs point to Antonin Scalia and Bryan Garner's READING LAW: THE INTERPRETATION OF LEGAL TEXTS, which defines person to include corporations and other entities, but not the sovereign, as evidence that person encompasses municipalities. See Tr. at 16:10-15 (Harrison). The Plaintiffs then discuss legislative history, including the fact that Congress specifically considers and rejects a special exemption for government entities. See Tr. at 17:4-6 (Harrison).

The Court then asks the parties a series of questions. First, the Court asks the City of Albuquerque what about municipalities counsels treating them different from any other entity treated as person. See Tr. at 19:2-6 (Court). The City of Albuquerque answers that municipal corporations have a distinctly different identity from private corporations: they do not have shareholders, they do not pay taxes, private individuals do not own them, they provide public services, and they are political entities. See Tr. at 19:12-16 (Mullins). The Court then asks the Plaintiffs why the fact that Congress specifically defines person under the TCPA should not counsel a different interpretation of the word in comparison to its interpretation under 42 U.S.C. § 1983, which does not define person. See Tr. at 21:6-16 (Court). The Plaintiffs respond generally by discussing why the TCPA's person includes municipal corporations. See Tr. at 22-24 (Harrison). Next, the Court asks, and both parties agree, that Skidmore deference requires a finding of statutory ambiguity before an application of the deference framework. See Tr. at 32: 20-25 (Court, Harrison, Mullins). The Court questions the City of Albuquerque on the TCPA's emergency provision, which replaces a prior exemption for governmental entities. See Tr. at 47: 23-25 (Court). The City of

Albuquerque answers that this argument is a legislation-by-implication argument, and that the Court should not imply that governments are subject to suit based on the removal of certain words. See Tr. at 43:15-22 (Mullins). The Plaintiffs then enter into a discussion of how municipal corporations work, see Tr. at 53-55 (Harrison), and, finally, conclude with a response to the Court's question about case law precedent that weighs against their position. See Tr. at 56:5-15 (Harrison).

**LAW REGARDING RULE 12(b)(6)**

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("Ashcroft")(citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Twombly")). "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice." Ashcroft, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Twombly, 550 U.S. at 570).

## LAW REGARDING THE HOBBS ACT

The Hobbs Act provides, in relevant part: "The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communication Commission made reviewable by section 402(a) of title

47." 28 U.S.C. § 2342(1). "Under the Hobbs Act, when the FCC issues certain orders, any 'party aggrieved' has 60 days to file a petition in a court of appeals seeking review of the order and declaratory or injunctive relief against the enforcement of the order." McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 152 (2025)("McLaughlin"). See 28 U.S.C. §§ 2342, 2344, 2349. "The Hobbs Act requires parties who want to challenge the legality of agency rules or orders in a pre-enforcement proceeding to do so both promptly and in a court of appeals." McLaughlin, 606 U.S. at 153. "That pre-enforcement review process avoids the delays and uncertainty that otherwise could ensue from multiple pre-enforcement suits filed across time in multiple district courts and from subsequent appeals in the courts of appeals." McLaughlin, 606 U.S. at 153.

The Supreme Court, however, recently clarified in McLaughlin that the Hobbs Act does not bar "different parties in subsequent enforcement proceedings from arguing -- and district courts from concluding -- that the agency incorrectly interpreted the statute." McLaughlin, 606 U.S. at 153. The Supreme Court concludes:

> Fundamental principles of administrative law establish the proper default rule: In an enforcement proceeding, a district court must independently determine for itself whether the agency's interpretation of a statute is correct. District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.

McLaughlin, 606 U.S. at 155.

## LAW REGARDING SKIDMORE DEFERENCE

Between 1984 and 2024, courts defer to agency interpretations of ambiguous statutes that the federal agency administers, and this deference is known as Chevron deference, named after Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)("Chevron"). Chevron deference is a two-step process that first asks whether the statutory

- 12 -

provision in question is clear and, if it is not, then asks whether the agency's interpretation of the unclear statute is reasonable. Chevron, 467 U.S. at 842-43. The Supreme Court overturns this deferential approach, however, in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024)("Loper Bright"). In lieu of Chevron's presumption, the Supreme Court observes that "[t]he better presumption is . . . that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch." Loper Bright, 603 U.S. at 403. What takes the place of Chevron deference, therefore, is ordinary judicial interpretation of statutes, and courts are free to review and reject statutory interpretations that federal agencies offer. See Loper Bright, 603 U.S. at 403. Loper Bright does not disturb, however, Skidmore deference. See Loper Bright 603 U.S. at 394.

"Under the framework set forth in Skidmore, the 'paramount consideration' is whether an agency's 'decision has 'the power to persuade.'" Carpio v. Holder, 592 F.3d 1091, 1098 (10th Cir. 2010)(quoting Skidmore, 323 U.S. at 140). "Under Skidmore, the degree of deference given informal agency interpretations will 'vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." S. Utah Wilderness All. v. Bureau of Land Mgmt., 425 F.3d 735, 759 (10th Cir. 2005)(quoting United States v. Mead Corp., 533 U.S. 218, 228 (2001)), as amended on denial of reh'g (Jan. 6, 2006). As the Honorable Antonin Scalia, then-Associate Justice for the Supreme Court, has explained: "Skidmore deference is a 'statement of the obvious: A judge should take into account the well-considered views of expert observers.'" Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1146 n. 10 (10th Cir. 2010)(quoting United States v. Mead Corp., 533 U.S. at 250). Under Skidmore, the "degree of deference . . . 'var[ies] with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the

persuasiveness of the agency's position.'" Carpio v. Holder, 592 F.3d at 1098 (quoting United States v. Mead Corp., 533 U.S. at 228)(alteration added).

## LAW REGARDING STATUTORY CONSTRUCTION

When interpreting statutes, the Court must start with the plain language.  See Been v. O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory construction de novo, 'interpret[ing] the words of the statute in light of the purposes Congress sought to serve.'")(quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233-34 (10th Cir.2006)).  "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)). See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "'would lead to absurd results . . . or would thwart the obvious purpose of the statute'")(quoting Commissioner v. Brown, 380 U.S. 563, 571 (1965)). "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'" United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir.2000)).  See Public Lands Council v. Babbit, 167 F.3d 1287, 1314 (10th Cir. 1999)(Seymour, C.J., dissenting)("In examining . . . [statutory] language, we assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress' [] legislative purpose.").

"A statute is ambiguous when it is 'capable of being understood by reasonably well-

informed persons in two or more different senses.'" United States v. Quarrell, 310 F.3d 664, 669 (10th Cir. 2002)(quoting In re Geneva Steel Co., 281 F.3d 1173, 1178 (10th Cir. 2002)).  "The plainness or ambiguity of statutory language is determined by the reference to the language itself, and the specific context in which that language is used, and the broader context of the statute as a whole."  Ceco Concrete Const., LLC v. Centennial State Carpenters Pension Tr., 821 F.3d 1250, 1258 (10th Cir. 2016)(quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).  If statutory meaning cannot be derived "merely by reference to the text," a court "may also look to traditional canons of statutory construction to inform our interpretation," Conrad v. Phone Directories Co., 585 F.3d 1376, 1381 (10th Cir. 2009), and "may seek guidance from Congress's intent, a task aided by reviewing the legislative history," In re Geneva Steel Co., 281 F.3d at 1178.  "Ambiguous text can also be decoded by knowing the purpose behind the statute."  In re Geneva Steel Co., 281 F.3d at 1178.

## LAW REGARDING THE FCC DECISION IN BROADNET II

The Plaintiffs rely heavily on the FCC's decision in support of their argument that the Court should deny the MTD, arguing both that the Court should give Skidmore deference to the FCC decision, and that the Court should independently conclude that the TCPA applies to local governments.  The Court, therefore, finds it instructive to give a thorough overview of the Broadnet II decision.

In Broadnet II, the FCC reconsiders a declaratory ruling that it issues in In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991 Broadnet Teleservices LLC Nat'l Emp. Network Ass'n Rti Int'l, 31 F.C.C. Rcd. 7394 (2016)("Broadnet I"), where the FCC determines that both the federal government and federal contractors are not "persons" within the TCPA's definition.  See Broadnet I, 31 F.C.C. Rcd. ¶¶ 14, 16, at 7400-02.  The FCC partially

reverses Broadnet I in Broadnet II, and concludes that the word "person" in the TCPA does include

federal contractors. See Broadnet II, 35 F.C.C. Rcd. ¶ 13, at 15056. As part of this ruling, the FCC

clarifies that a State government is not a person under the TCPA, whereas both State contractors

and local governments are persons. See Broadnet II, 35 F.C.C. Rcd. ¶ 13, at 15056.

The FCC offers several arguments in support of its conclusion that local governments are

"persons" within the definition of the TCPA. First, the FCC relies on the fact that, "unlike federal

and state governments, local governments are not sovereign" and therefore are not entitled to an

"interpretive presumption that they are not a 'person.'" Broadnet II, 35 F.C.C. Rcd. ¶ 29, at 15062.

The FCC concludes that this lack of sovereign status and the fact that local governments generally

have been treated as persons subject to suit requires a conclusion, absent a clear indication to the

contrary from Congress, that local governments are "persons" within the TCPA. See Broadnet II,

35 F.C.C. Rcd. ¶ 29, at 15062. The FCC then looks at the Communications Act's definition of

"person," which governs the TCPA: "the term 'person' includes an individual, partnership,

association, joint-stock company, trust, or corporation." See Broadnet II, 35 F.C.C. Rcd. ¶ 30, at

15063 (quoting 47 U.S.C. § 153(39)). The FCC concludes that local governments fall within this

definition, because local governments consistently have been treated as municipal corporations, and

that "municipal corporations, like private corporations, have been "'treated alike in terms of their

legal status as persons capable of being sued.'" Broadnet II, 35 F.C.C. Rcd. ¶ 30, at 15063 (quoting

Cook Cnty., Ill. v. U.S. ex rel. Chandler, 538 U.S. 119, 120 (2003)("Cook County"); (citing Monell

v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 663 (1978)("Monell"). Hedging its

bets, the FCC states: "To the extent there is any doubt of a local government's status as a corporation

or quasi-corporation, we interpret the Act's definition of 'person' as expansive and find that it

encompasses a broader range of entities than just corporations, including, for example,

'individuals,' 'associations', and 'trusts.'" Broadnet II, 35 F.C.C. Rcd. ¶ 32, at 15064.

The FCC then turns to consider legislative history, and states that "the lack of any clear indication that Congress intended to exclude local governments from the TCPA is evidence that Congress intended such government entities to fall under its purview." Broadnet II, 35 F.C.C. Rcd. ¶ 31, at 15063.  The FCC concludes that "[g]iven the common understanding of local government entities as corporations and not sovereign entities, Congress would have known to explicitly exclude local governments from the definition of 'person' had that been its intent." Broadnet II, 35 F.C.C. Rcd. ¶ 31, at 15063.  The FCC also points to legislative history which shows that Congress considers a special exemption for calls that a public school or other governmental entity places, and ultimately rejects this provision, instead providing an exemption for emergency purposes, "to allow the use of automated calls when private individuals as well as schools and other governmental entities call for emergency purposes." Broadnet II, 35 F.C.C. Rcd. ¶ 33, at 15064.  The FCC states that its current decision is in line with its prior decision in Blackboard, where the FCC determined that schools were subject to the TCPA when it determined that only telephone calls "closely related to the school's mission" fell under the emergency exception of the TCPA, but all other automatic telephone calls made by the school required prior express consent.  See Broadnet II, 35 F.C.C. Rcd. ¶ 34, at 15065.

The FCC then addresses the arguments that commenters and Broadnet make in support of the conclusion that local governments do not fall within the definition of person in the TCPA.  The FCC distinguishes the cases cited by commenters by stating that "we believe those cases are better understood as turning on unique aspects of those statutory schemes that are not present here." See Broadnet II, 35 F.C.C. Rcd. ¶ 35, at 15065 ("For example, while [commenter] cites cases that purportedly support the conclusion that municipalities are not considered 'corporations,' the two

- 17 -

statutes at issue in these cited cases, the Federal Power Act and the Natural Gas Act, expressly exclude municipalities from their definition of 'corporation,' which is not the case with the Communications Act."). Additionally, the FCC rejects the argument that because other sections of the Communications Act may distinguish 'person' from entities like 'municipal corporations,' local governments are necessarily not 'persons' within the meaning of the Act. See Broadnet II, 35 F.C.C. Rcd. ¶ 36, at 15065. The FCC points to context, and argues that the TCPA is enacted after the development of modern case law regarding the scope of "person," whereas the relevant language pointed to by commenters is in the original Communications Act enacted in 1934. See Broadnet II, 35 F.C.C. Rcd. ¶ 36, at 15066. The FCC therefore concludes that the cited provisions of the Communications Act are distinguishable and not controlling. See Broadnet II, 35 F.C.C. Rcd. ¶ 36, at 15066. As a result of all of the arguments stated above, the FCC concludes that local governments do fall within the definition of person under the TCPA.

**LAW REGARDING MUNICIPAL CORPORATIONS**

The history of the modern American conception of "municipal corporation" starts with the English tradition of "corporations." Joan C. Williams, The Invention of the Municipal Corporation: A Case Study in Legal Change, 34 AM. U. L. REV. 369, 370 (1985)("The Invention of the Municipal Corporation"). English corporation law develops as a "coherent doctrinal framework" throughout the fifteenth and sixteenth centuries, and has its roots in feudal society. The Invention of the Municipal Corporation at 373-74. Corporate entities include "chartered boroughs, companies of merchants, including guilds, and universities." The Invention of the Municipal Corporation at 374. Villages and towns, however, are not corporations. See The Invention of the Municipal Corporation at 374. The distinction arises from the "late feudal practice of granting charters to groups that wanted to 'opt out' of feudal obligations." The Invention of the Municipal Corporation at 374.

During feudal times, no sharp distinction exists between public and private powers, and this lack of distinction has a lasting impact on English society.  See The Invention of the Municipal Corporation at 376.  As a result, corporations in England have a mix of both public and private powers, a holdover from the late middle ages "when the traditional set of borough powers was defined."  The Invention of the Municipal Corporation at 376.

This is the legal starting point from which "municipal corporations" in the United States develop.  The Invention of the Municipal Corporation at 370.  It should be noted, however, that "the influence of the English borough system upon the development of local government in the United States cannot be considered of preponderant importance."  Charles W. Tooke, The Status of the Municipal Corporation in American Law, 16 MINN. L. REV. 343, 350 (1932)("The Status of the Municipal Corporation").  See HENDRICK HARTOG, PUBLIC PROPERTY AND PRIVATE POWER: THE CORPORATION OF THE CITY OF NEW YORK IN AMERICAN LAW, 1730-1870 220 (1983)("PUBLIC PROPERTY AND PRIVATE POWER")("Between 1835 and 1860 appellate judges created a new American law of municipal corporations. . . .  No lines of continuity bound the judicial doctrines of municipal corporation law to the ancient common law.").  This result is because "the theory of their relation to the general government, based as it was upon the royal prerogative, could not well fit in with the constitutional organization of the American state." The Status of the Municipal Corporation at 350.

When settling in the United States,  English colonists establish agencies "to provide for their local government needs." The Status of the Municipal Corporation at 350.  The New England towns that develop are "the nearest historical prototypes of the municipal corporations that were later developed throughout the nation." The Status of the Municipal Corporation at 350. In Massachusetts, courts very early on reject English corporation law.  See The Invention of the

Municipal Corporation at 410.  As early as 1816, Massachusetts courts hold that Massachusetts towns are not boroughs.  See The Invention of the Municipal Corporation at 410.  "The boroughs' mixture of public and private powers clashed with the growing tendency in the eighteenth century to think of the national government as purely public." The Invention of the Municipal Corporation at 375. When faced with "the intellectual challenge of defining the relationship between their use of the words corporate and corporation and the traditional uses of these words in English law, the [Massachusetts'] courts concluded that towns were a special type of municipal or quasi corporation." The Invention of the Municipal Corporation at 421.  This decision reflects a "growing consensus in early 19th century Massachusetts that towns were different from business corporations."  The Invention of the Municipal Corporation at 430.

By contrast, New York develops its municipal corporations on a different trajectory than New England.  See PUBLIC PROPERTY AND PRIVATE POWER 13-14.  Contrary to New England towns, New York City begins as a chartered city, akin to the borough corporations from England. See PUBLIC PROPERTY AND PRIVATE POWER 13-14 ("Eighteenth-century New York was a corporation . . . There were only the particular powers granted to the singular institution of the city of New York by the various charters culminating in the Montgomerie Charter of 1730").  For the first several decades, the law in New York "applied English corporation law virtually unchanged in cases involving New York City."  The Invention of the Municipal Corporation at 393.  The status of New York City as a chartered city contributes to the slow development of the law of municipal corporations, because "chartered cities were already part of an undifferentiated 'law' of corporations."  PUBLIC PROPERTY AND PRIVATE POWER 185 ("For Steward Kyd, whose Treatise on the Law of Corporations remained the leading work on both sides of the Atlantic until the 1830s, boroughs were simply one type of civil corporation.").  Despite New York City beginning as a

chartered city, however, the law by the mid-1830s throughout the United States coalesces around a distinct separation between private corporations and municipal corporations.  PUBLIC PROPERTY AND PRIVATE POWER 210-11.  Hendrick Hartog in his book PUBLIC PROPERTY AND PRIVATE POWER explains:

> By the mid-1830s, however, "public corporations" and "private corporations" were increasingly viewed as separate categorical structures.  No public corporation could ever become a private corporation, nor would any private entity assume public status. . . . Even when cities had private aspects they remained public institutions.  This did not mean that analogies to private corporations would disappear from the developing law of municipal corporations.  For particular purposes or in particular situations a municipal corporation would be treated in the same way as a private corporation.  But as the contrast between public corporations and private entities grew more absolute, judges began to use the law of private corporations as a way of defining by negation the nature of a public entity.

PUBLIC PROPERTY AND PRIVATE POWER  210-11.  This transformation in the law also affects New York City's legal status: "[b]y the third quarter of the nineteenth century the legal individuality of the corporation no longer existed . . . whatever New York City had been in the past, by the 1820s it was fast becoming a municipal corporation."  PUBLIC PROPERTY AND PRIVATE POWER 180-81.

The Supreme Court of the United States embraces this distinction between public and private corporations in Trs. of Dartmouth Coll. v. Woodward, 17 U.S. 518 (1819).  See The Invention of the Municipal Corporation at 434 ("The traditional view is that the distinction between public and private corporations was a brilliant insight of the Supreme Court in the Dartmouth College case in 1819."); Morton J. Horwitz, The History of the Public/Private Distinction, 130 U. PA. L. REV.  1423, 1425 (1982)("[E]ntirely novel separation between public and private corporations in the Dartmouth College Case, decided in 1819.")("History of the Public/Private Distinction"); PUBLIC PROPERTY AND PRIVATE POWER 193 ("For the various members of the court what was public was not private; what was private could never be public.  A public corporation was nothing but an agency of the state; a private corporation assumed the character of a private

citizen."). The Supreme Court holds that Dartmouth College is a private corporation, such that the New Hampshire Legislature cannot alter Dartmouth College's charter because of the Contracts Clause of the Constitution of the United States, U. S. CONST. art. I, § 10. See Trs. of Dartmouth Coll. v. Woodward, 17 U.S. at 555-57, 654. The purpose of the opinion "was to free the newly emerging business corporation from the regulatory public law premises that had dominated the prior law of corporations, whether municipal or trading corporations, both of which were regarded as arms of the State." The History of the Public/Private Distinction at 1425. Both the majority opinion and "Justice Story's famous concurring opinion" address the distinction between private and public corporations. The History of the Public/Private Distinction at 1425. The majority differentiates between public and private corporations, stating: "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. . . . But this being does not share in the civil government of the country, unless that be the purpose for which it was created." Trs. of Dartmouth Coll. v. Woodward, 17 U.S. at 636. Justice Story is more explicit in discussing the distinction and states:

> Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by the government, for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private. . . .

Trs. of Dartmouth Coll. v. Woodward, 17 U.S. at 668-69.

This distinction remains throughout the development of the understanding of municipal corporations. In the first edition of BLACK'S LAW DICTIONARY, "municipal corporation" is "a public corporation, created by government for political purposes, and having subordinate and local powers of legislation; e.g., a county, town, city, etc." MUNICIPAL CORPORATION, BLACK'S LAW

DICTIONARY 794 (1st ed. 1891).  More tellingly, the first edition, when defining "corporation" states: According to the accepted classification of corporations, they are first divided into public and private. A public corporation is one having for its object the administration of a portion of the powers of government delegated to it for that purpose; such are municipal corporations. All others are private.  CORPORATION, BLACK'S LAW DICTIONARY 278 (1st ed. 1891).  This emphasis on a distinction between municipal corporations and private corporations remains in the modern definition of "municipal corporation," which defines the term as: "[A] city, town, or other local political entity formed by charter from the state and having the autonomous authority to administer the state's local affairs; esp., a public corporation created for political purposes and endowed with political powers to be exercised for the public good in the administration of local government. . . . in the eyes of the law [the municipal corporation] is the only ideal of a complete public corporation." MUNICIPAL CORPORATION, BLACK'S LAW DICTIONARY 1175 (12th ed. 2024).

The municipal corporation is "essentially political in character and purpose." 1 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 1:59 (3d ed. 2022)("THE LAW OF MUNICIPAL CORPORATIONS").  "It is merely a public agency of the local inhabitants in their organized municipal capacity, and of the state insofar as it performs state functions within its corporate limits." THE LAW OF MUNICIPAL CORPORATIONS § 1:59.  This political purpose is what distinguishes the municipal corporation from the corporation.  See THE LAW OF MUNICIPAL CORPORATIONS § 1:60 ("The Supreme Court early took the position that the city is a public institution, created for public purposes only.").  Although a municipal corporation is a "dual-bodied public corporation; on one hand, it is a corporate body, capable of performing the same proprietary functions as any private corporation, while on the other hand, it is an arm of the state," THE LAW OF MUNICIPAL CORPORATIONS § 1:59, it does not lose its "governmental character because of its

proprietary rights." THE LAW OF MUNICIPAL CORPORATIONS § 1:63. "Like charitable corporations or private franchises, a city might have the power to hold property, to sue and be sued as an individual, to make internal bylaws, and so forth.  But that [does] not make the city into a private entity. . ." PUBLIC PROPERTY AND PRIVATE POWER  194. The municipal corporation's public status commands that "the legal conception is sound, namely, that the corporation should be conducted in harmony with the principles of government rather than the rules which pertain to the conduct of the business of the individual or private corporation."  THE LAW OF MUNICIPAL CORPORATIONS § 1:63.

Finally, in terms of statutory interpretation, "[g]enerally provisions in state constitutions or statutes using the word corporation, standing by itself, are held not to include a municipal corporation." THE LAW OF MUNICIPAL CORPORATIONS § 2:20.  Although "[t]he term corporation in some constitutional and statutory provisions has been so broadly used at times as to include both public and private corporations, including municipal corporations in the strict sense of the term, [] such an extended meaning may be rebutted by the inapplicability of the statute or provision in the constitution to a public corporation." THE LAW OF MUNICIPAL CORPORATIONS § 2:20.  "Unless the statute or constitutional provision was apparently intended to include both municipal corporations proper and quasi-municipal corporations, it will not be so construed." THE LAW OF MUNICIPAL CORPORATIONS § 2:20.

**ANALYSIS**

The Court first addresses whether to defer ruling until the Tenth Circuit has decided Silver v. City of Albuquerque, where the issue in this case is before the Tenth Circuit.  The Tenth Circuit decides Silver v. City of Albuquerque on April 23, 2025, and therefore the Court declines to defer reaching a ruling in this case.  See Notice of Opinion, Judgment, and Mandate from the Tenth Circuit, at 1, filed May 16, 2025 (Doc. 18).  The Court next addresses whether the Court is bound,

- 24 -

under the Hobbs Act, by the relevant FCC ruling -- Broadnet II -- finding that a municipality is a "person" under the TCPA.  Relying on the Supreme Court's decision in McLaughlin, the Court concludes that it is not bound under the Hobbs Act by the FCC's decision in Broadnet II.  The Court then addresses whether local governments are within the definition of person under the TCPA.  The Court determines, based on plain language analysis and the legislative history, that local governments are not persons under the TCPA.  Finally, the Court discusses whether the Court will give Skidmore deference to the FCC ruling in Broadnet II.  The Court concludes that the FCC's decision is not well-reasoned such that it is persuasive enough for the Court to afford Broadnet II Skidmore deference.  Accordingly, the Court grants the MTD.

**I.      BECAUSE THE TENTH CIRCUIT HAS DECIDED SILVER V. CITY OF ALBUQUERQUE, THE COURT DECLINES TO DEFER A RULING IN THIS CASE.**

The City of Albuquerque requests that the Court defer a ruling until the Tenth Circuit decides Silver v. City of Albuquerque, because the threshold legal issue that the City of Albuquerque's MTD raises -- whether local governments are included within the definition of person under the TCPA -- is dispositive in Silver v. City of Albuquerque as well, and is currently under review by the Tenth Circuit.  See MTD at 2.  The City of Albuquerque contends that moving forward with this motion threatens to cause a significant waste of resources and that, to promote an orderly administration of justice, the Court should defer its decision until the Tenth Circuit decides the appeal in Silver v. City of Albuquerque.  See MTD at 11-12.  The Tenth Circuit reaches a decision in Silver v. City of Albuquerque on April 23, 2025, but declines to reach the question whether local governments are persons under the TCPA.  See Silver v. City of Albuquerque, 134 F.4th at 1131 n.1 ("Because we conclude that the City's calls fall within the TCPA's emergency purposes exception, we need not determine whether local governments qualify as persons under

that statute."). The Court, therefore, sees no need to defer a ruling in this case; because, however, the Court waits to rule on the MTD until after the Tenth Circuit has issued a ruling in Silver v. City of Albuquerque, the Court effectively grants this portion of the MTD.

## II.    UNDER THE SUPREME COURT PRECEDENT IN MCLAUGHLIN, THE COURT CONCLUDES THAT THE FCC'S DECISION IN BROADNET II DOES NOT BIND THE COURT UNDER THE HOBBS ACT.

The Plaintiffs argue that the Court does not have jurisdiction to decide a challenge to the FCC's interpretation of the TCPA because of the Hobbs Act, which restricts jurisdiction to hear challenges to final orders that the FCC issues exclusively to Courts of Appeals. See Response at 6. The Supreme Court's opinion in McLaughlin makes clear, however, that the Hobbs Act does not bar a district court from reviewing the FCC's statutory interpretations, and from reaching a different conclusion than the FCC if the district court determines it is appropriate to do so. See McLaughlin, 606 U.S. at 152. McLaughlin involves an FCC order that interprets the TCPA. See McLaughlin, 606 U.S. at 149. Among other restrictions, the TCPA prohibits a business from sending an "unsolicited advertisement" by fax to a "telephone facsimile machine" absent an opt-out notice informing recipients that they can choose not to receive future faxes. 47 U.S.C. § 227(b)(1)(C). "In 2009 and 2010, in an effort to promote McKesson's products, a McKesson subsidiary sent unsolicited fax advertisements to various medical practices." McLaughlin, 606 U.S. at 149. "McLaughlin Chiropractic Associates received some of those faxes." McLaughlin, 606 U.S. at 149-50. In 2014, McLaughlin sues McKesson, alleging that McKesson violates the TCPA by "faxing unsolicited advertisements without the opt-out notice that the statute requires." McLaughlin, 606 U.S. at 150. "As McLaughlin's lawsuit progressed, another company with no connection to the litigation petitioned the FCC for a declaratory ruling about whether the TCPA applies to faxes received through online fax services." McLaughlin, 606 U.S. at 150. "The FCC ruled that 'an online

fax service is not a telephone facsimile machine'" and that "[u]nder that interpretation, the TCPA would not prohibit faxes received through online fax services." McLaughlin, 606 U.S. at 150 (quoting In re Amerifactors Financial Group, LLC, 34 FCC Rcd. 11950, ¶ 11 at 11953 (2019)).  As the parties recognized, "if the FCC's *Amerifactors* order were binding on the District Court, it would undermine McLaughlin's class action lawsuit because McLaughlin defined the class to involve plaintiffs who received unsolicited faxes through online fax services."  McLaughlin, 606 U.S. at 150.  The district court subsequently decides that the FCC ruling is, under the Hobbs Act, binding on the district court, because FCC orders are subject to the exclusive review of the Court of Appeals. See McLaughlin, 606 U.S. at 151.  On appeal, the United States Court of Appeals for the Ninth Circuit affirms.  See McLaughlin, 606 U.S. at 151.  The Supreme Court overturns the Ninth Circuit, however, and holds that "[t]he Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct."  McLaughlin, 606 U.S. at 152.  The Supreme Court concludes that a district court's appropriate response when asked to interpret language of the TCPA which the FCC had previously interpreted is to "interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."  McLaughlin, 606 U.S. at 152.

The Court concludes that McLaughlin governs here.  Just like in McLaughlin, where the FCC had previously interpreted the meaning of "telephone facsimile machine" under the TCPA, here the FCC has interpreted the definition of "person" under the TCPA to include municipalities. In McLaughlin, the Supreme Court holds that the FCC's interpretation, under the Hobbs Act, does not preclude the district court from conducting its own independent statutory interpretation. See McLaughlin, 606 U.S. at 152.  Applying that holding here, the Court concludes that it is not barred under the Hobbs Act by the FCC's interpretation from conducting its independent statutory

construction of the word "person" under the TCPA.  The Court therefore engages in an analysis of the meaning of the word "person" under the TCPA "using ordinary principles of statutory interpretation." McLaughlin, 606 U.S. at 152.

## III.    THE COURT DETERMINES THAT A MUNICIPAL CORPORATION IS NOT A PERSON UNDER THE TCPA.

When interpreting statutes, the Court must start with the plain language.  See Been v. O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory construction de novo, 'interpret[ing] the words of the statute in light of the purposes Congress sought to serve.'")(quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233-34 (10th Cir.2006)).  If statutory meaning cannot be derived "merely by reference to the text," however, a court "may also look to traditional canons of statutory construction to inform our interpretation," Conrad v. Phone Directories Co., 585 F.3d 1376, 1381 (10th Cir. 2009), and "may seek guidance from Congress's intent, a task aided by reviewing the legislative history," In re Geneva Steel Co., 281 F.3d at 1178. "Ambiguous text can also be decoded by knowing the purpose behind the statute." In re Geneva Steel Co., 281 F.3d at 1178.

The Court therefore begins its statutory construction analysis by looking at the statute's plain language.  The question before the Court is whether Congress intends to subject municipal corporations to the TCPA when it writes the following language: "It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States. . . ." 47 U.S.C. § 227(b)(1).  The Communications Act, which the TCPA amends, defines person as: "The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39).  The Court determines that, because Congress has defined the word "person," the appropriate analysis is whether municipal corporations are included within this definition and not whether the word "person," undefined, ordinarily

encompasses municipal corporations. Stenberg v. Carhart, 530 U.S. 914, 942 (2000)("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").  See Doyle v. Cnty. of Suffolk, No. 23-CV-8871 (JMA) (SIL), 2025 WL 948094, at * 5 (E.D.N.Y. Mar. 28, 2025)("[The Plaintiffs argue that] Suffolk County qualifies as a 'person' under the FWA because the term 'person' in 28 U.S.C. 1983 was interpreted in Monell to include municipalities. However, unlike Section 1983, the Wiretap Act specifically defines 'person.' Accordingly, the Court must focus on the particulars of this specific definition of 'person.' Monell, and its interpretation of 'person' in Section 1983, does not answer this question.").

A municipal corporation is not included in the words individual, partnership, association, joint-stock company, or trust.  The Plaintiffs argue, however, that when Congress writes the word "corporation," it intends to include municipal corporations.  See Response at 13.  The Court therefore first analyzes whether corporation includes municipal corporations.  Neither the Communications Act nor the TCPA defines the word "corporation."  The Court therefore begins by looking at the word's ordinary, common meaning.  See Perrin, 444 U.S. at 42.

In City of Lincoln, Neb. v. Ricketts, 297 U.S. 373, 374 (1936)("Ricketts"), the Supreme Court states: "A municipal corporation is a corporation in the usual sense of the term." 297 U.S. at 374.  The Supreme Court asks whether the Bankruptcy Act, the statute at issue in the case, uses "the term in a more limited sense?"  Ricketts, 297 U.S. at 374.  Looking at the definition of corporation in the Bankruptcy Act, the Supreme Court determines that the Bankruptcy Act does not use the term corporation in a more limited sense, and therefore encompasses both private and municipal corporations.  See Ricketts, 297 U.S. at 374-75.  The Bankruptcy Act defines corporation to mean:

> all bodies having any of the powers and privileges of private corporations not possessed by individuals or partnerships and shall include limited or other partnership associations organized under laws making the capital subscribed alone responsible for the debts of the association, joint stock companies, unincorporated

companies and associations, and any business conducted by a trustee, or trustees, wherein beneficial interest or ownership is evidenced by certificate or other written instrument.

Ricketts, 297 U.S. at 374 (quoting 11 U.S.C. § 1(6)).  The Supreme Court relies on the portion of the definition which states "all bodies having any of the powers and privileges of private corporations not possessed by individuals or partnerships" to conclude that the Bankruptcy Act's definition of corporations encompasses municipal corporations.  Ricketts, 297 U.S. at 374-75.  The Supreme Court concludes that the word corporation is not meant to describe only private corporations, because the term "embraces those which have powers and privileges analogous to those of private corporations and not possessed by individuals or partnerships," and that "[m]unicipal corporations have such powers and privileges and thus fall within the definition of the term corporations as used in the Bankruptcy Act."  Ricketts, 297 U.S. at 375.  With Ricketts in mind, the Court turns to look at how the term "corporation" is used in the TCPA and concludes that, unlike in Ricketts, the TCPA uses the term "corporation" in a more limited sense, to extend only to private corporations.

Unlike the Bankruptcy Act in Ricketts, the TCPA does not define "corporation."  The TCPA does, however, use the term "corporation" to define the term "person" in conjunction with the following terms: individuals, partnerships, associations, joint-stock company, and trusts.  47 U.S.C. § 153(39).  Applying the canon of construction called noscitur a sociis -- "a word is known by the company it keeps" -- which courts rely on to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress," the Court concludes that the term "corporation" is intended to encompass only private corporations.  Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995).  The canon noscitur a sociis requires that "words grouped in a list should be given related meaning."  Dole v. United

Steelworkers of Am., 494 U.S. 26, 36 (1990)(quoting Massachusetts v. Morash, 490 U.S. 107, 114 (1989)).  The TCPA's definition of "person" groups corporations with individuals, partnerships, associations, joint-stock company, and trusts -- all private, non-governmental entities. 47 U.S.C. § 153(39).  "Thus, while the list is not exhaustive, it indicates that the meaning of 'person' here is limited to private, non-governmental entities." Clark v. Buffalo City Sch. Dist., No. 21-CV-700-JLS, 2021 WL 5764703,  at * 2 (W.D.N.Y. Oct. 28, 2021)(Sinatra, J.).  See also Lambert v. Seminole Cnty. Sch. Bd., 2016 WL 9453806, at * 3 (M.D. Fla. Jan. 21, 2016)("Conspicuously absent from this definition of 'person' is any mention of governmental entities."). The Court therefore concludes that the word corporation, as used in the TCPA, is used in a more limited sense than it is used in Ricketts, and that Ricketts does not require the conclusion here that a municipal corporation is subsumed within the word corporation in the definition of person under the TCPA. [3]

---

[3] This conclusion follows the decisions in City of Clinton, Ark. v. Pilgrim's Pride Corp. and Doyle v. Cnty. of Suffolk, which both hold that Ricketts does not demand the conclusion that the use of the term corporation in a statute's definition of person results in a finding that the term "person" also encompasses municipal corporations.  See City of Clinton, Ark. v. Pilgrim's Pride Corp., 653 F. Supp. 2d 669, 673 (N.D. Tex. 2009)(Means, J.), aff'd, 632 F.3d 148 (5th Cir. 2010)("And unlike the bankruptcy provisions at issue in Ricketts, the PSA does not include a definition of corporation that causes the term 'person' to encompass any legal entity with the powers or privileges of a private corporation.  Indeed, the PSA does not define 'corporation' at all, leaving the Court to give that term its plain meaning.  Quite simply, '[i]n common parlance, towns, cities and other municipal organizations are not [referred to] as corporations.'")(quoting City of Webster Groves v. Smith, 340 Mo. 798, 801, 102 S.W.2d 618, 619 (1937))(alterations in City of Clinton, Ark. v. Pilgrim's Pride Corp. but not in City of Webster Groves v. Smith);  Doyle v. Cnty. of Suffolk, No. 23-CV-8871 (JMA) (SIL), 2025 WL 948094, at * 6 (E.D.N.Y. Mar. 28, 2025)(Azrack, J.)("The FWA does not define 'corporation' in such broad terms.  Ricketts is distinguishable, and the Court concludes that the specific language used in § 2510(6) indicates that corporation does not include municipal corporations.").

Further, this conclusion is in line with decisions in Clark v. Buffalo City School District and Lambert v. Seminole County School Board, both of which conclude that the term "person" in the TCPA does not extend the TCPA to municipal entities.  See No. 21-CV-700-JLS, 2021 WL 5764703, at * 2 (W.D.N.Y. Oct. 28, 2021)(Sinatra, Jr., J.); No. 6:15-CV-78-ORL-18DAB, 2016 WL 9453806, at * 3 (M.D. Fla. Jan. 21, 2016)(Sharp, J.).

Nor, the Court concludes, is a municipal corporation included independently within the TCPA's definition of person.  The FCC, whose arguments the Plaintiffs incorporate by reference, concludes that it interprets the TCPA's definition of "person" as "expansive."  See Broadnet II, 35 F.C.C.R. ¶ 32 at 15064. See Response at 13.  The FCC does not expand upon its reasoning for this conclusion, but the Court notes that the definition of "person" under the TCPA begins with the term "includes." 47 U.S.C. § 153(39).  Although not required to be expansive, the term "includes" can be an expansive term.  See Samantar v. Yousuf, 560 U.S. 305, 317 (2010)("It is true that use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive.").  Even though the term may be expansive, however, the word is still "not one of all-embracing definition, but connotes simply an illustrative application of the general principle." Fed. Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941).  In defining the general principle of the definition of person under the TCPA, the Court applies the noscitur a sociis canon, and, as discussed above, concludes that the definition of a person under the TCPA is limited to private, non-governmental entities.  Accordingly, the Court determines that the list of terms defining who qualifies as a person under the TCPA, while not exhaustive, does not encompass municipal corporations.  As a result, the Court concludes that municipal corporations fall outside the ambit of the TCPA's cause of action.

Statutory context also supports this conclusion.  The portion of the TCPA which grants a private right of action -- 47 U.S.C. § 227(3) -- states that "a person or entity" may bring action under the TCPA.  47 U.S.C. § 227(3).  Although the statute does not define the word entity, a plain reading of the term entity indicates that it can include a municipal corporation.  See Entity, BLACK'S LAW DICTIONARY (12th ed. 2024)("An organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners.").  The fact that Congress includes the word

"entity" alongside "person" in the statute means that Congress does not intend the word "person" to be read so broadly as to include entities, including governmental entities, not listed in the definition. See Adams v. City of Battle Creek, 250 F.3d 980, 985 (6th Cir. 2001)("The addition of the words 'entity' can only mean a governmental entity because prior to the 1986 amendments, the definition of 'person' already included business entities. In order for the term not to be superfluous, the term 'entity' necessarily means governmental entities."). In Henry v. United States, when answering the question whether a municipal corporation could bring suit under the TCPA, the Honorable Colleen Kollar-Kotelly, United States District Judge for the United States District Court for the District of D.C., concludes that, although the word "person" does not extend to municipal corporations, municipal corporations are an "entity" and therefore may bring suit. See Henry v. United States, No. CV 20-3689 (CKK), 2021 WL 6619330, at * 9 (D.D.C. Sept. 30, 2021)("Although the TCPA defines 'person' as 'an individual, partnership, association, joint-stock company, trust, or corporation,' 47 U.S.C. § 153(30), it does not contain a definition for 'entity.' A plain reading of the term 'entity' suggests that it could cover, for example, a municipal corporation such as Orland Park.").

The Communications Act, which contains the TCPA's definition of person, also distinguishes "person" from entities such as municipal corporations. See 47 U.SC. § 208(a). Section 208(a) of the Communications Act states "any person, any body politic, or municipal organization, or State commission . . . ." 47 U.SC. § 208(a). The FCC argues that this section of the Communications Act is distinguishable, because "we must look to the context" and states that, "[i]n this context, we note that the TCPA was enacted after the development of modern case law regarding the scope of 'person,' including cases that addressed whether that term includes municipalities." Broadnet II, 35 F.C.C.R. ¶ 36, at 15055-66. The Court disagrees with the FCC

that the fact that Congress enacts the Communications Act in 1934 necessarily makes the Communications Act statutory language irrelevant to the inquiry of the definition of person under the TCPA.  See Broadnet II, 35 F.C.C.R. ¶ 36, at 15066.  The definition of "person" in the TCPA is in the Communications Act.  47 U.S.C. § 153(30).  Courts "assume that Congress is aware of existing law when it passes legislation."  Hall v. United States, 566 U.S. 506, 516 (2012)(quoting Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990)).  The Court, therefore, assumes that Congress is aware of this Communications Act provision, which differentiates between person and municipal organizations. As a result, the Court concludes that, if Congress had intended "person" to be used differently in the TCPA than under the Communications Act, it could have acted to ensure that result.

Finally, the Plaintiffs argue that, "given the common understanding that the term 'person' includes local governments, Congress would have known to explicitly exclude them from the TCPA had that been its intent."  Response at 13.  The correct analysis, however, is not whether Congress believes "municipal corporation" to be within the word "person" as ordinarily defined and therefore would have known to exclude municipal corporations, but instead whether Congress believes "municipal corporation" to be within the word "person" as the TCPA defines that word -- defining person to mean specifically an individual, partnerships, associations,  corporations, joint-stock company, and trusts.  There are statutes which demonstrate that Congress does not understand the term "corporation" to include municipal corporations when defining the term "person." These statutes show Congress specifying municipalities as falling under the statute's coverage despite the statute's separate inclusion of corporations. 47 U.S.C. § 1362(5)("The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or interstate body"); 43 U.S.C. § 1331(d)("The term "person" includes, in

addition to a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation"). See e.g, 42 U.S.C. § 7602(e); 42 U.S.C. § 9601(21). Although not conclusory evidence, these statutes lend support to the conclusion that if Congress intends municipal corporations to be included in the definition of person under the TCPA statute, it can include municipal corporations in the listed definition, even despite the inclusion of the word "corporation." For this reason, and all of the reasons stated above, the Court determines that the statute's plain language supports the conclusion that a municipal corporation is not a "person" under the TCPA.

The Court determines that the statute's plain language settles the question before the Court. The Court, therefore, "look[s] to the legislative history to determine only whether there is clearly expressed legislative intention contrary to that language, which would require [the Court] to question the strong presumption that Congress expresses its intent through the language it chooses." I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987). Congressional findings indicate that Congress focuses on the problem of commercial telemarketing, specifically preventing calls for commercial solicitation and advertising. See H. R. REP. 102-317, at 5; S. REP. 102-178, at 1. In defining telephone solicitation, Congress states that, "[t]o come within the definition, a caller must encourage a commercial transaction." H. R. REP. 102-317, at 13. The House also states an intent to exclude calls from charitable or political organizations from TCPA coverage, determining that "unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations." H.R. REP. 102-317, at 16. Although the House makes reference to "tax exempt nonprofit organizations," this reasoning can extend equally to municipal corporations, which provide public services for citizens and are not commercial in nature. See H.R. REP. 102-317, at 16.

The Committee made the public policy determination to exclude calls made by charitable or political organizations on the basis of the record, which does not contain sufficient evidence to demonstrate that calls from these tax-exempt nonprofit organizations should be subject to the restrictions provided for under the bill. To the contrary, the record suggests that most unwanted telephone solicitations are commercial in nature.

H.R. REP. 102-317, at 16.  Additionally, the House's explicit reference to governmental entities implies governmental exclusion from the TCPA's prohibitions.  See H. R. Rep. 102-317, at 12 (stating that the "[Congressional Budget Office] estimates that enactment of this bill would result in no cost to state or local governments").

The Senate appears to have envisioned the bill more broadly than the House, however, stating that the bill "applies equally whether the automated message is made for commercial, political, charitable, or other purposes." S. REP. 102-178, at 4.  The Plaintiffs also, by incorporation of the FCC's arguments, points to one of the bill's revisions as support for the contention that Congress intends the TCPA to encompass local governments.  See Response at 13.  "The bill as introduced banned automated telephone calls unless the call was placed by a 'public school or other governmental entity.' The reported bill replaces this language with an exception for 'any emergency purposes.'" S. REP. 102-178, at 5.  Congress states that this change is made so that automated calls are allowed "when private individuals as well as schools and other government entities call for emergency purposes." S. REP. 102-178, at 5.  The FCC concludes that "Congress' decision to strike a blanket exception for public schools, and its justification therefore, makes clear it considered that local government entities (of which public schools are a part) are persons." Broadnet II, 35 F.C.C.R. ¶ 33, at 15064.  The Court does not conclude, as the FCC does, that it is so obvious that this revision is an explicit expression of Congress's intent to subject local governments to the TCPA.  Congress does not state that it removes the exemption because the TCPA applies to municipal corporations.  Further, it is "unreasonable to conclude that Congress intended to subject an entire class of

defendants to potential liability without any expression of that intent in the legislative commentary." Abbott v. Vill. of Winthrop Harbor, 205 F.3d 976, 980 (7th Cir. 2000)(quoting Amati v. City of Woodstock, 829 F.Supp. 998, 1003 (N.D.Ill.1993)(Reinhard, J.)).  Congress states only that it creates a blanket emergency calls exception, which applies to undefined "governmental entities." S. REP. 102-178, at 5.  The Court determines that the legislative record is not sufficient to conclude that it specifically references municipal corporations.  See Entity, BLACK'S LAW DICTIONARY (12th ed. 2024)(defining public entity as "[a] governmental entity, such as a state government or one of its political subdivisions.").  See, e.g., 15 U.S.C. § 6602(3) (demonstrating an example of how Congress understands governmental entities by defining government entity to mean "an agency, instrumentality, or other entity of Federal, State, or local government (including multijurisdictional agencies, instrumentalities, and entities)").  The Court also disagrees with the FCC's conclusion that, because Congress references schools, that it necessarily also references municipal corporations.  Although the term local government entity encompasses school districts, the same is not true in reverse.  See Government, BLACK'S LAW DICTIONARY (12th ed. 2024).  School is not a broad umbrella term that encompasses all other local government entities or municipal corporations. See School, BLACK'S LAW DICTIONARY (12th ed. 2024).  The Court, therefore, declines to read into Congress' use of the term "school" as an expression of Congress' intent to encompass municipal corporations.  Looking at the legislative history as a whole, it does not demonstrate "the most extraordinary showing of contrary intentions [that] would justify a limitation on the 'plain meaning' of the statutory language."  Garcia v. United States, 469 U.S. 70, 75 (1984).

Finally, the Court concludes that the statute's purpose supports a finding that the TCPA does not apply to municipal corporations.  Congress enacted the TCPA to "protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising

uses of the telephone and related telecommunications equipment." H. R. REP. No. 102-317, at 5. See S. REP. 102-178, at 1 (amending the Communications Act of 1934 to "prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes").  The TCPA demonstrates a strong purpose of preventing telemarketers from harassing consumers.  By contrast, the TCPA does not demonstrate a strong purpose of preventing governments from communicating non-commercial information to its citizens. See Broadnet I, 31 F.C.C. Rcd. ¶ 12, at 7399 n.62 ("Although the TCPA's application is not limited to commercial calls, the legislative history indicates that Congress was particularly focused on telemarketing,"); Cheng v. Speier, No. 22-16170, 2023 WL 4490352, at * 1 (9th Cir. July 12, 2023)(concluding that robocalls promoting virtual town halls made by a federal legislator or agents acting under authority validly conferred by the federal government are lawful under the TCPA, because the federal government is not a "person" under the TCPA, and observing that the TCPA's "legislative history lacks any indication that Congress sought to impede these important government communications, as opposed to telemarketing and other calls by private entities").  The Court, therefore, concludes that the statute's purpose also supports the conclusion that the TCPA does not apply to municipal corporations. Finding no reason either in the legislative history or the statute's purpose that convinces the Court to interpret the TCPA differently than how the plain language commands, the Court concludes that a municipal corporation is not a "person" under the TCPA.

IV.    **THE COURT DECLINES TO AFFORD <u>SKIDMORE</u> DEFERENCE TO THE FCC DECISION IN BROADNET II.**

The Supreme Court counsels in McLaughlin that a district court, when approaching an issue of statutory interpretation that the FCC decides, should interpret the statutory language "using ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." McLaughlin, 606 U.S. at 152.  Prior to the Supreme Court's decision in Loper

Bright, under Chevron deference, courts had to defer to agency interpretations of ambiguous statutes that the federal agency administered.  See Flores-Molina v. Sessions, 850 F.3d 1150, 1157 (10th Cir. 2017).  The Supreme Court overturns this deferential approach in Loper Bright, however, and states that, instead, "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch."  603 U.S. at 403.  The appropriate deference, therefore, that remains after Loper Bright, and which the Court will consider here, is Skidmore deference.

Skidmore deference does not require that the Court defer entirely to agency interpretations of ambiguous statutes.  See Loper Bright, 603 U.S. at 402.  Instead, the Court should decide the case "based on [its] independent judgment," and an agency's interpretation of a statute merits deference under Skidmore only in proportion to its power to persuade.  See Suncor Energy (U.S.A.), Inc. v. United States Env't Prot. Agency, 50 F.4th 1339, 1354 (10th Cir. 2022)(quoting Kisor v. Wilkie, 588 U.S. 558, 630 (2019)(Gorsuch, J., concurring).  In determining the agency's interpretation's power to persuade, courts look at "the degree of the agency's care, its consistency, formality, and relative expertness," as well as the overall persuasiveness of the agency's position. United States v. Mead Corp., 533 U.S. at 228.  Before deciding whether an agency's decision is deserving of deference, the court must first look to "the statute to determine whether Congress 'has spoken directly to the precise question at issue' in such a way that its intent is clear and unambiguous." Kientz v. Comm'r, SSA, 954 F.3d 1277, 1280 (10th Cir. 2020)(quoting Wedelstedt v. Wiley, 477 F.3d 1160, 1165 (10th Cir. 2007)).  "In that circumstance, we 'owe no deference to the agency's interpretation and must give effect to the statute as Congress intended it.'"  Kientz, 954 F.3d at 1281 (quoting Wedelstedt v. Wiley, 477 F.3d at 1165).  The Court determines in Section III above that the use of the word "person" under the TCPA unambiguously does not include

municipal corporations.  Even if it is ambiguous, however, looking at the FCC's decision in Broadnet II, the validity of the FCC's reasoning does not counsel the Court to afford deference to the FCC's decision.

An analysis of the contextual factors discussed by Skidmore and its progeny convinces the Court that the FCC's position in this case is not entitled to Skidmore deference.  First, courts defer to agencies under Skidmore because of their relative expertise.  See Suncor Energy (U.S.A.), Inc. v. United States Env't Prot. Agency, 50 F.4th 1339, 1355 (10th Cir. 2022)(stating that a consideration when assessing Skidmore is the "interstitial nature of the legal question, [and] the related expertise of the agency").  But the FCC is no more expert, however, than the Court in determining the meaning of the word "person" under the TCPA.  The interpretation of the word "person" is not an interpretation that relies on the FCC's technical or specialized expertise.  See Loper Bright, 603 U.S. at 403 ("And although an agency's interpretation of a statute 'cannot bind a court,' it may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'")(quoting Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 98 n. 8 (1983)). By contrast, "legal interpretation, [] has been, 'emphatically', 'the province and duty of the judicial department' for at least 221 years." Loper Bright, 603 U.S. at 412 (quoting Marbury v. Madison, 5 U.S. 137, 177 (1803)).  Accordingly, because the interpretation of the language at issue -- "person" -- is not dependent on expertise that the FCC possesses and which the Court does not, the Court concludes that this factor weighs against a finding of deference.

The Plaintiffs argue that the FCC has held a consistent position on the interpretation of the word "person" by pointing to its 2016 decision in Blackboard, in which the FCC declines to exempt public schools from the TCPA's scope, and to the FCC's COVID-19 related declaratory ruling and subsequent clarification, in which the FCC explicitly treats local governments as subject to the

TCPA in the course of discussing the emergency purposes exception. See Blackboard, 31 FCC Rcd. 9054 at ¶¶ 17-25;  In re TCPA, Declaratory Ruling, CG Dkt. No. 02-278, 35 FCC Rcd. 2840, ¶¶ 2, at 2840 (March 20, 2020); CGAB Clarification on Emergency COVID-19 Related Calls, CG Dkt. No. 02-278, 35 F.C.C. Rcd. 7924, 7924 (July 28, 2020).  It is worth noting that both the In re TCPA, Declaratory Ruling and CGAB Clarification on Emergency COVID-19 Related Calls, when discussing who is exempt from the TCPA's coverage for emergency pandemic-related calls, the FCC states that "hospitals, health care providers, state and local health officials, and other government officials may lawfully communicate" under the emergency provision.  In re TCPA, Declaratory Ruling, CG Dkt. No. 02-278, 35 FCC Rcd. at ¶¶ 2, 2840.  See CGAB Clarification on Emergency COVID-19 Related Calls, CG Dkt. No. 02-278, 35 F.C.C.R. at 7294-25.  This statement is overbroad in its understanding of TCPA coverage, as it envisions State officials and potentially other government officials, not explicitly excluding federal, as subject to the TCPA's coverage, along with local officials.  The Court therefore notes the persuasiveness of these rulings is lessened by its overbreadth.  In spite of this, the Court does, however, note that the FCC appears to have been consistent in its opinion that local governments are subject to the TCPA from 2016 onwards.

The Plaintiffs also argue that the FCC's decision is thorough.  The Court agrees that the FCC addresses numerous considerations in its decision, including plain language analysis, Congressional intent, and statutory purpose.  The Court does not conclude, however, that the thoroughness or consistency of the FCC's decision is sufficient to afford Skidmore deference when both the lack of FCC expertise and the validity of the FCC's reasoning are considered.  And, the Supreme Court has similarly declined to afford Skidmore deference when it finds the validity of agency's reasoning lacking, even despite consistent agency views.  See Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360-61 (2013)("Respondent and the Government also argue that

applying the motivating-factor provision's lessened causation standard to retaliation claims would be consistent with longstanding agency views . . . [The agency's] explanations lack the persuasive force that is a necessary precondition to deference under Skidmore.").

The Court determines that the FCC's plain language approach is incorrect.  The Court concludes that this is sufficient to decline Skidmore deference, because statutory interpretation begins and ends with plain language construction.  See Coffey v. Freeport McMoran Copper & Gold, 581 F.3d 1240, 1245 (10th Cir. 2009)(stating that, in ascertaining Congressional statutory intent, courts "begin by examining the statute's plain language, and if the statutory language is clear, [the] analysis ordinarily ends").  The FCC begins by looking at the definition of "person" generally and states that, "unlike the federal and state governments, local governments are not sovereign." Broadnet II, 35 F.C.C.R. ¶ 29, at 15062.  The FCC states that this difference necessarily leads to the conclusion that "[l]ocal governments, therefore, are not subject to an interpretive presumption that they are not a 'person.'"  Broadnet II, 35 F.C.C.R. ¶ 29, at 15062.  The FCC concludes that, therefore, "[a]bsent a clear indication that Congress intended the TCPA to exclude local government entities . . . we believe that the best interpretation of the TCPA is one that finds that local government entities are 'persons' subject to TCPA restrictions." Broadnet II, 35 F.C.C.R. ¶ 29, at 15062.  The FCC concludes that "the definition of 'person' encompasses local governments because they are not sovereign entities and have generally been treated as persons subject to suit." Broadnet II, 35 F.C.C.R. ¶ 29, at 15062.  The Court would not take issue with this conclusion, if the TCPA did not define the word "person."  In fact, the Supreme Court has been clear that local governments are included within the ordinary meaning of the word "person." See Monell, 436 U.S. at 701 ("[T]here is no justification for excluding municipalities from the 'persons' covered by § 1"); Cook County, 538 U.S. at 126 (quoting Monell, 436 U.S. at 687-88)("[M]unicipal corporations, like private ones,

'should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.'"). Unlike in Monell and Cook County, however, where the statutes at issue do not define the word "person," here Congress defines the word "person," defining it in the Communications Act, which the TCPA amends. The Supreme Court has stated that, "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." Stenberg v. Carhart, 530 U.S. 914, 942 (2000). The correct question, therefore, is not what presumption generally applies when the word "person" is used, but what Congress intends "person" to mean when Congress defines the word within the statute.

Instead, the FCC should have begun with the definition of "person" as provided by Congress. That definition is: "The term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39). To its credit, the FCC next turns to the definition that Congress provides. The Court concludes, however, that the FCC does not analyze the definition correctly. The question is whether a municipal corporation falls within the definition of "person" that Congress provides in the statute. A municipal corporation is not an individual, partnership, association, joint-stock company, or trust. The analysis, therefore, necessarily must rest on whether Congress also intends to include municipal corporations when it writes the word corporation. The FCC concludes that local governments "as non-sovereign entities fall within this definition," because "[m]unicipal corporations, like private corporations, have been 'treated alike in terms of their legal status as persons capable of suing and being sued.'" Broadnet II, 35 F.C.C.R. ¶ 30, at 15063 (quoting Cook County, 538 U.S. at 126). The fact, however, that both corporations and municipal corporations are considered "persons capable of suing and being sued" does not answer the correct question whether Congress intends municipal corporations when it writes the word corporation. The FCC states that "[l]ocal government entities have been treated

as corporations unless the state otherwise provides." Broadnet II, 35 F.C.C.R. ¶ 30, at 15063. The cases that the FCC cites, however, establish only that local governments are municipal corporations, and not that municipal corporations are commonly referred to as corporations. Broadnet II, F.C.C.R. ¶ 30, at 15063 (citing Trs. of Dartmouth Coll. v. Woodward, 17 U.S. at 663)("In respect to public corporations, which exist only for public purposes, such as towns, cities"); Laramie Cnty. Comm'rs v. Albany Cnty. Comm'rs, 92 U.S. 307, 308 (1875)("Counties, cities, and towns are municipal corporations, created by the authority of the legislature")). The FCC does not engage in an analysis of the ordinary meaning of the word corporation or discuss the caselaw addressing the question whether the word "corporation" encompasses municipal corporation. The FCC cites caselaw differentiating municipal corporations from corporations, which supports the opposite conclusion that municipal corporations is not within the definition that Congress provides of "person." Broadnet II, F.C.C.R. ¶ 31, at 15063 (citing Levy Court v. Coroner of Washington Cty., 69 U.S. 501, 507-08 (1864)(explaining that a local government entity, even "if not a corporation in the full sense of the term, it is a quasi corporation"); Quasi-Corporation, BLACK'S LAW DICTIONARY (11th ed. 2019)(defining a "quasi-corporation" as "[a]n entity that exercises some of the functions of a corporation but that has not be granted corporate status by statute; esp., a public corporation with limited authority and powers (such as a county or school district)," which is "[a]lso sometimes termed quasi-municipal corporation").

The FCC next asserts that it "interprets the Act's definition of 'person' as expansive," concluding that "this upholds Congress' intent to encompasses a broad range of entities within the Act's definition of 'person,' absent some hoary statutory interpretation principle, such as sovereign immunity, that would support a different conclusion." Broadnet II, F.C.C.R. ¶ 32, 15064. The FCC provides no statutory explanation why the term should be interpreted expansively, and, even if the

term is interpreted expansively, why the term should be interpreted to include municipal corporation.  While it is true that the term "includes" can be an expansive term, it is not always expansive.  Samantar v. Yousuf, 560 U.S. 305, 317 (2010)("It is true that use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive.").  Even if the term is expansive, and the listed examples of what is within "person" are merely illustrative, however, there still must be analysis to determine what else is within the definition of "person."  It is insufficient, without engaging with the definition of person provided, to point to a municipal corporation's lack of sovereign immunity as conclusory of the fact that Congress intends municipal corporations to be within the definition.  One way to determine Congress' intent is to look to canons of construction, specifically noscitur a sociis -- which means that a word is known by the company it keeps.  See Yates v. United States, 574 U.S. 528, 543 (2015).  The canon works to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."  Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995).  To correctly analyze the definition of "person," therefore, the FCC should have engaged in an analysis whether municipal corporation fits in with the other terms listed in the definition of person: "individual, partnership, association, joint-stock company, trust, or corporation."  47 U.S.C. § 153(39).

Next, "[t]he plainness of statutory language 'is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  United States v. Burkholder, 816 F.3d 607, 614 (10th Cir. 2016)(quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).  The FCC does not engage, however, in any analysis of the TCPA statutory context.  Specific instances of statutory context that the Court concludes that the FCC must consider are TCPA other provisions which reference "person" as "person or entity,"

and what Congress' choice to include "or entity" in other portions of the statute indicate about Congress's intent when it chose to merely write "person." 47 U.S.C. § 227(b)(3).

The FCC engages with the statutory context of the Communications Act, which provides the definition of person under the TCPA. A commenter argues that another section of the Communications Act, 47 U.S.C. § 208(a), which differentiates between person and municipal corporation, means that the Communication Act's definition of "person" necessarily cannot include municipal corporations. See Broadnet II, 35 F.C.C.R ¶ 36, at 15065. The FCC dismisses this argument, because of the context that "the TCPA was enacted after the development of modern case law regarding the scope of 'person,' including cases that addressed whether that term includes municipalities." Broadnet II, 35 F.C.C.R ¶ 36, at 15066. Despite the FCC's conclusion, this context, however, does not dispose of the commenter's argument. Congress had already defined the word "person" in the Communications Act; therefore, the question is what person means when considering that definition. And, the statutory context of the Communications Act is necessarily helpful to understanding the definition as stated in the Communications Act. The Court therefore finds the FCC's treatment of this analysis unpersuasive.

Finally, when analyzing statutory language, interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 7 (2011)(quoting Dolan v. Postal Service, 546 U.S. 481, 486 (2006)). The FCC does not engage with the district court opinions that had addressed the question of whether a municipal corporation is a person under a statue that defines person as "includes an individual, partnership, association, joint-stock company, trust, or corporation," 47 U.S.C. § 153(39), and had concluded that a municipal corporation is not a person. See Lambert v. Seminole Cnty. Sch. Bd., No. 6:15-CV-78-

- 47 -

ORL-18DAB, 2016 WL 9453806, at * 3 (M.D. Fla. Jan. 21, 2016)(Sharp, J.)("[T]he Court concludes that the TCPA's cause of action is unavailable against the School Board. . . . Conspicuously absent from this definition of 'person' is any mention of governmental entities."); City of Clinton, Ark. v. Pilgrim's Pride Corp., 653 F. Supp. 2d 669, 672-74 (N.D. Tex. 2009), aff'd, 632 F.3d 148 (5th Cir. 2010)(concluding that a city does not qualify as a person within the meaning of the Packers and Stockyards Act, which defines "person" exactly the way the Communications Act does). Although the Court acknowledges that these cases are not binding on the FCC, or any other courts, nevertheless the Court concludes that they are relevant precedent that inform the analysis, and that they should have been engaged with by the FCC.  For all the reasons stated in this section, the Court concludes that FCC's reasoning is not valid.  This lack of validity, when paired with the FCC's lack of expertise in this area of statutory interpretation, leads the Court to conclude that the FCC's opinion is not deserving of Skidmore deference.  Accordingly, the Court will not afford Skidmore deference to the FCC's conclusion that a municipal corporation is a person under the TCPA.

        **IT IS ORDERED** that: (i) Defendant City of Albuquerque's Motion to Dismiss and Defer Ruling Until the Tenth Circuit has Decided the Issue Presented, filed January 17 (Doc. 4), is granted; and (ii) the case is dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Carter B. Harrison
Harrison & Hart, LLC
Albuquerque, New Mexico

        *Attorney for the Plaintiff*

- 48 -

Cerianne Lynn Mullins
Mark T Baker
Peifer, Hanson, Mullins & Baker, P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendant*